# EXHIBIT 1



1 November 2022

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Hanover Insurance Company, The
440 Lincoln Street
Worcester, MA 01653

    Re:   **Blakeney Preserve Homeowners Association, Inc.**

          vs.

          **Hanover Insurance Company, The**

Dear Corporate Secretary:

    Enclosed herewith are document[s] entitled **Civil Summons and Complaint [Jury Trial Demanded]** in the above action which this Department received on **October 27, 2022**.

Mike Causey
Commissioner of Insurance

Courtney H. Ethridge
Special Deputy for
Service of Process

Enclosure



**Blakeney Preserve Homeowners Association, Inc.**

vs.                                    **Mecklenburg Co. File No. 22 CVS 18146**

**Hanover Insurance Company, The**


I, Courtney H. Ethridge, a Special Deputy duly appointed for the purpose, do hereby accept service of the **Civil Summons and Complaint [Jury Trial Demanded]** in this action and acknowledge receipt of a copy of the same, under the provision of the North Carolina General Statute Section 58-16-30 as process agent for **Hanover Insurance Company, The.**


This the **27th** day of **October, 2022.**

Mike Causey
Commissioner of Insurance

Courtney H. Ethridge
Special Deputy for
Service of Process

# STATE OF NORTH CAROLINA

MECKLENBURG County

File No. 22 CVS 18146

In The General Court Of Justice
☐ District ☒ Superior Court Division

**Name Of Plaintiff**
BLAKENEY PRESERVE HOMEOWNERS ASSOCIATION, INC

**Address**

**City, State, Zip**

## CIVIL SUMMONS

☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

## VERSUS

**Name Of Defendant(s)**
THE HANOVER AMERICAN INSURANCE COMPANY et al

**Date Original Summons Issued**

**Date(s) Subsequent Summons(es) Issued**

### To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| THE HANOVER INSURANCE COMPANY | THE HANOVER INSURANCE GROUP, INC. |
| c/o Mike Causey, Commissioner of Insurance | c/o Mike Causey, Commissioner of Insurance |
| NC Department of Insurance | NC Department of Insurance |
| 1201 Mail Service Center  Raleigh      NC      27699 | 1201 Mail Service Center  Raleigh      NC      27699 |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out!
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as
possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.
¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible
acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos
documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time |
|---|---|---|
| Robert H. Jessup | 10-14-22 | 10:06 ☒AM ☐PM |
| Howard Stallings From Atkins Angell & Davis | **Signature** | |
| Post Office Box 12347 | | |
| Raleigh                        NC      27605 | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time |
|---|---|---|
| This summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | | ☐ AM ☐ PM |
| | **Signature** | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

| | RETURN OF SERVICE |
|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

22-CVS-_____

BLAKENEY PRESERVE
HOMEOWNERS ASSOCIATION, INC.,

                      Plaintiff,

v.

THE HANOVER AMERICAN
INSURANCE COMPANY; HANOVER
AMERICAN INSURANCE COMPANY;
THE HANOVER INSURANCE
COMPANY; and THE HANOVER
INSURANCE GROUP, INC.;

                      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

---

**NOW COMES** Plaintiff Blakeney Preserve Homeowners Association, Inc., by and through undersigned counsel, to complain of the Defendants by alleging and saying as follows:

<u>PARTIES</u>

1.     Plaintiff is a North Carolina homeowners' association. At all times relevant to this Complaint, Plaintiff owned and operated a complex of forty-two (42) multi-family residential buildings located in Charlotte, North Carolina (hereinafter, the "Property").

2.     Defendants Hanover American Insurance Company and The Hanover American Insurance Company are, upon information and belief, a single corporation organized and existing under the laws of the State of New Hampshire; however, in some places, this corporation is registered as "Hanover American Insurance Company," while in others, it is registered as "The Hanover American Insurance Company." For example, it is registered only as "Hanover American Insurance Company" with the National Association of Insurance Commissioners and with the

North Carolina Insurance Commissioner in their consumer and service databases, while it lists itself as "The Hanover American Insurance Company" in its insurance policies and in certain incorporation documents. At all times relevant hereto, Defendants Hanover American Insurance Company and The Hanover American Insurance Company were transacting substantial business in the State of North Carolina.

3.      Defendant The Hanover Insurance Company is a corporation organized and existing under the laws of the State of New Hampshire. At all times relevant hereto, it was transacting substantial business in the State of North Carolina.

4.      Defendant The Hanover Insurance Group, Inc. is a corporation organized and existing under the laws of the State of Delaware. At all times relevant hereto, Defendant The Hanover Insurance Group, Inc. was transacting substantial business in the State of North Carolina.

5.      Defendants Hanover American Insurance Company, The Hanover American Insurance Company, The Hanover Insurance Company, and The Hanover Insurance Group, Inc. shall herein be collectively referred to as "Defendants."

## JURISDICTION & VENUE

6.      Jurisdiction is proper pursuant to N.C.G.S. §§ 7A-240 and 7A-243.

7.      The Defendants have been properly served and brought before the Court pursuant to Rule 4 of the North Carolina Rules of Civil Procedure.

8.      Venue is proper pursuant to N.C.G.S. § 1-82.

## FACTUAL ALLEGATIONS

9.      At the times relevant hereto, the Property was insured by Defendants under an insurance policy, assigned policy number ZZ6 D646950 01 (hereinafter the "Policy") (Exhibit A).

10. Wind and hail damage to the Property and its roofs is a Covered Cause of Loss under the Policy, in addition to any ensuing losses therefrom.

11. On or about March 10, 2021, Plaintiff submitted insurance claims to Defendants (subsequently assigned Claim Nos. 85-00029601 and 85-00031072 by Defendants; hereinafter "the Claims") for hail and wind damage to the Property and its roofs.

12. In connection with the Claims, Plaintiff retained Premier Public Adjusting, LLC ("Premier") to assist with the investigation and valuation of the Claims. Premier conducted its initial inspection and published its report to Defendants in March of 2021, valuing the net claim at $7,612,622.14. A copy of the Premier Report is attached hereto as Exhibit B.

13. In connection with the Claims, Defendants first retained an independent adjuster, Mr. Fred Young, to assist with the investigation and adjustment. Mr. Young met with Premier on April 6, 2021 to inspect the Property. Premier and Mr. Young were only able to inspect a few buildings that day, as Mr. Young's purported fear of heights and physical frailties caused the group to move slowly.

14. As part of the inspection process, Premier marked areas of hail damage with chalk. On multiple occasions during the April 6, 2021 inspection, Mr. Young removed his gloves and erased chalk marks made by Premier.

15. Mr. Young expressed that it would take him a few months to inspect all buildings on the Property due to his purported fear of heights and physical frailties. Premier informed Mr. Young that this arrangement and schedule would delay the adjustment of the Claims and was unacceptable.

16.     Premier conducted a second inspection with Mr. Young on or about April 22, 2021. During this inspection, Mr. Young continually refused to acknowledge wind and hail damages that were clearly indicated, documented and photographed by Premier.

17.     Following the April 22, 2021 inspection, neither Plaintiff nor Premier heard from Mr. Young or Defendants for several weeks.

18.     On or about May 3, 2021, Premier received a call from Mr. Jeremey Higgins with Engle Martin Adjusters. Mr. Higgins informed Premier that Mr. Young had been removed from the Claims and that he would be taking over.

19.     Mr. Higgins inspected the Property on or about May 6, 2021. Mr. Higgins made note of damages to the roofs consistent with hail and wind on the few buildings he inspected. He informed Premier that he would get in touch with Defendants to ascertain how they wanted to proceed with the Claims given the significant scope of damage to the Property. Mr. Higgins stated that he would return with a team of adjusters from his office to complete the inspection in a timely and complete manner.

20.     Neither Plaintiff nor Premier heard from Mr. Higgins, Engel Martin, or Defendants for several months.

21.     On or about July 1, 2021, Premier finally received an email from Defendants indicating that the Claims were no longer with Mr. Higgins and were now being handled within their home office.  Defendants indicated that coverage would be reviewed and finalized on the following day.

22.     Contrary to this representation, over a week passed with no word from Defendants. A Premier public adjuster followed up with Defendants on or about July 9, 2021 with the following message: "I am just curious where we stand with the coverage decision. It has been over a week

since I have heard from anyone and we need to get this moving along . . . I believe 7 days is ample time to get a decision over to me and I eagerly await your decision. Let me know if there is anything else that you need from me? Also can you please advise on next steps?"

23.     One week later, on or about July 16, 2021, Plaintiff received a reservation of rights letter stating that Defendants will continue to investigate the Claims. Defendants stated that there were "numerous dates where significant hail fell" and that a structural engineer or roofing consultant would now be needed to determine: (1) whether the damage occurred during the Policy period; and (2) whether spot repairs were possible.

24.     On or about July 16, 2021, Defendants reassigned the Claims to its employee and agent, Mr. Jacques Lemerand, in Defendants' "Major Case Unit."

25.     In early August of 2021, Defendants informed Premier that they would be sending an engineer to inspect the Property. Upon request, Defendants identified the engineer as Mr. Nathaniel Haney with EFI Global. Upon information and belief, EFI Global is owned in whole or in part by major corporate players in the insurance industry, specifically including Sedgwick.

26.     On or about August 7, 2021, Premier emailed Defendants and expressed concerns regarding Defendants' claim handling to date. Plaintiff, and its individual homeowners, were particularly concerned with: (1) the amount of time it had taken to investigate and document the loss; (2) failure to pay the Claims; (3) the Claims being passed around among multiple adjusters; and (4) the fact that the different adjusters agreed on the existence of varying degrees of wind and hail damage, yet Defendants failed to formally extend coverage. This message also contained specific questions regarding Engineer Haney's qualifications and methodology. None of these questions or concerns were ever addressed. A copy of the email is attached hereto as Exhibit C.

27.     On or about August 9, 2021, Premier, Mr. Lemerand, Engineer Haney, and two "private consultants"—Mr. John Schneider and Mr. Trevor Hackworth—met to discuss the Claims. Defendants gave no notice that they were enlisting the services of "private consultants," and the "private consultants" showed up to the meeting to the surprise of Premier.

28.     Engineer Haney's statements at the meeting raised several red flags. To begin, Premier asked Engineer Haney if Premier could have EFI Global' s criteria for defining and determining wind and hail damage. Engineer Haney responded that his company does not have "anything like that." Premier then asked Engineer Haney directly how he makes his judgment on damages and what references he uses to determine damages, to which he responded that he notes damages based on "[his] own opinion." These statements reflected an alarming lack of objectivity in Engineer Haney's methodology and analysis.

29.     These red flags caused Premier to be justifiably concerned with the legitimacy of Engineer Haney's inspection. Premier voiced these concerns directly to Defendants' agent and employee, Mr. Lemerand. However, Mr. Lemerand was dismissive of Premier's reasonable concerns, and he failed to address the same. Instead, Engineer Haney was allowed to proceed.

30.     On or about August 10, 2021, Premier met with Engineer Haney to inspect the Property for wind and hail damage.

31.     Engineer Haney published his Roof Covering Assessment Report on or about August 20, 2021. A copy of the report is attached hereto as Exhibit D.

32.     Engineer Haney documented extensive hail and wind damage at the Property. However, he cited weather data claiming that hail occurred in the area only on April 9, 2011 (a date on which the Defendants did not insure the Property) and April 8, 2020 (a date on which the Defendants did insure the Property). Engineer Haney's report then summarily concluded that the

HOWARD, STALLINGS, FROM, ATKINS, ANGELL & DAVIS, P.A.
Attorneys at Law
Raleigh, North Carolina

2020 hail was too small to create the damage to the Property and that said damage must have occurred in 2011. The only purported support Mr. Haney had for this conclusion was a single CoreLogic Weather Report he had pulled.

33.     Upon information and belief, CoreLogic's analysis is based on an algorithm that evaluates *potential* for hail and then *estimates* the potential size of any hail in the area—not actual physical observations or historical reports. Indeed, CoreLogic expressly disclaims the accuracy of their data in the *Important Legal Notice and Disclaimer* section of their reports.

34.     Engineer Haney's conclusion that the April 8, 2020 hail was too small to cause the claimed damage was based on differences in measurements of less than a ½", taken with a standard tape measure while in the field—not in a lab setting—and based on a limited sample size of damage locations at the Property.

35.     Engineer Haney's conclusion that the April 8, 2020 hail was too small to cause the damage was based on a single computer algorithm that predicts the size of hail based on weather conditions on a given date—not actual measurements or reports of hail- and based upon his own personal assumptions and biases.

36.     Engineer Haney failed to account for the fact that the hail on April 8, 2020 was driven by winds of up to 25 miles per hour. Such wind-driven hail was capable of creating damage consistent with the indentations' diameter. Mr. Haney's failure to account for wind-driven hail reflects a fatal flaw in his methodology and analysis.

37.     Regarding wind damage, Engineer Haney attributed all wind damage to being solely related to manufacturing defects and improper roof ventilation. These conclusions ignored basic scientific methodologies, the obvious evidence, and North Carolina's concurrent causation law.

38.     Engineer Haney's report states that repairability can be assessed by "debonding individual shingles for testing or by locating and testing shingles that are poorly bonded or not bonded." However, Mr. Haney admits in his report that he did not follow either of these methods to assess repairability.  Nevertheless, Engineer Haney's report concludes that spot repairs of individual damaged shingles is the appropriate mechanism of repair, rather than actual roof replacements.

39.     Taken together, these statements indicate that Engineer Haney made conclusions about the repairability of the Property's roofs without an adequate factual basis. Indeed, the report outlines methods for analyzing the repairability of a damaged roof and then explicitly admits that the methods were not used.

40.     On or about August 24, 2021, Plaintiff received a letter from Defendants rejecting the Proof of Loss (POL) submitted five months earlier. Defendants rejected the POL "for reasons including, but not limited to: (1) the POL was premature as submitted before the engineering investigation was complete; (2) an alleged lack of documentation regarding costs, damages, and weather reports; (3) "the submitted proof of loss has a date of loss that is not the same as the reported date of loss;" and (4) coverage and limitations remained under review at the time.

41.     On or about August 30, 2021, Premier responded to the denial. Premier took care to note that there is no industry practice and no Policy language requiring the insured to wait for the insurer's claim investigation to conclude before submitting a POL. Further, Premier noted Defendants' duty to explain with specificity why the POL was deficient and Defendants' failure to do so. A copy of the email is attached hereto as Exhibit E.

42.     Defendants did not respond until on or about October 8, 2021. Defendants then stated that they had retained Forensic Weather Consultants to determine when the hail and wind

events occurred that damaged the Property. The letter went on to assert that the two correct dates of loss were as follows: (1) April 8, 2020, for hail damage; and (2) April 13, 2020, for wind damage. Based on these assertions, Defendants then required the Plaintiff to resubmit the Claims to match these dates of loss.

43.     By October 8, 2021, it had become reasonably clear that the Property suffered a covered loss during the Policy period. However, rather than making any attempt to pay the Claims, Defendants halted all claim processing until "once we have confirmed that our Insured would like to proceed with the two separate claims [being reassigned to the foregoing dates of loss]." Plaintiff agreed to Defendants' request to prevent further delays in Defendants' claims investigation. A copy of Defendants' October 8 letter is attached hereto as Exhibit F.

44.     On or about October 27, 2021, Defendants requested that Engineer Haney be permitted to inspect the Property once again from November 3–10, 2021. Defendants threatened to deny coverage for the Claims if this demand was not accommodated.

45.     Notwithstanding Defendants' delay tactics to date, Plaintiff agreed to a second joint site inspection to allow Engineer Haney to once again evaluate the damage.

46.     On or about November 15, 2021, Engineer Haney published his first supplemental report on wind and hail damage to the roofs. The report concluded that "[h]ail occurred on the subject property, as discussed in our original report dated August 20, 2021 and amended August 25, 2021." This statement admits that liability for hail damage under the Policy was reasonably clear nearly 90 days before this report was published. A copy of the supplemental report is attached hereto as Exhibit G.

47.     Engineer Haney's wind damage findings were inconclusive at best and, at worst, downright unreliable. Only 57 of the 414 wind damage sites were analyzed by Mr. Haney. Of those

57, the report claims that 4% of the shingles revealed evidence of wind damage. However, the report expressly states that "EFI **does not** recommend this value be used [sic] directly in providing estimates or quantities for any roofing repair work. Rather, it should be used as a lower bound for estimating the total number of wind damaged shingles possibly covered by the temporary roof patches" (emphasis in original). Engineer Haney's wind damage assessment is admittedly based on observations of only 13% of the Property's wind-damaged sites. Engineer Haney apparently called for individually spot repairing 414 damaged shingles, as opposed to actual roof replacements.

48.     On or about November 18, 2021, Defendants sent a letter to Premier stating its position that it had determined there was coverage for the wind and hail damage, but that of the $7,612,622.14 in damages claimed by the Plaintiff, it was only going to pay an amount of $377,740.84 under the hail claim and $40,749.61 under the wind claim, after deductibles and depreciation. These values reflect the only payments Defendants have made to date.

49.     These values are predicated on the misguided and debunked assertion by Defendants that the Property's roofs can be returned to pre-loss condition by individually spot repairing 414 individual shingles, rather than roof replacements.

50.     On or about January 11, 2022, Plaintiff and Premier documented attempts to repair roofs on the Property to show the futility of Defendants' proposed solution. To begin, the shingles on the original roof were discontinued and out of production. This created an unsightly appearance as the new shingles were immediately identifiable and different from the originals. Second, it was impossible to replace the damaged shingles without causing collateral damage to previously undamaged shingles, due to their overlap and the brittleness of the shingles. Finally, spot repairs

on the roofs created uneven ridges and compromised layers of the roof system that must be one continuous surface.

51. On or about January 17, 2022, Plaintiff had NTS conduct an objective lab analysis of its shingles in order to determine whether the roofs could be spot repaired. The NTS report concludes that the Property's shingles are no longer in production and that the manufacturer does not allow mixing of current shingle products with discontinued shingle product. The report confirmed that spot repairs were not possible. A copy of the report is attached hereto as <u>Exhibit</u> <u>H</u>.

52. The Plaintiff's failed attempts to repair, coupled with the objective third-party report, supported the conclusion that Plaintiff and Premier have held from the outset—the roofs cannot be returned to their pre-loss condition through spot repairs.

53. On or about February 28, 2022, Premier sent an updated demand package to Defendants. This package was accompanied by extensive photographic evidence displaying the futility of repair attempts, the NTS shingle report, the gutter repair quote, and Premier's quote to restore the property to its pre-loss condition, totaling $7,662,693.30.

54. On or about March 9, 2022, Defendants rejected Plaintiff's updated demand. Defendants maintained their position that the roofs could be spot repaired, despite Plaintiff's documented failed attempts to do so, and despite the NTS report explicitly stating that the Property's shingles were (1) not compatible with other shingles and (2) no longer in production.

55. Additionally, Defendants then demanded (1) a copy of all claim files from Plaintiff's prior insurance carriers, dating back over 12 years; and (2) an engineer report confirming Plaintiff's assertion that spot repairs are not possible.

56.     Premier responded to Defendants on or about March 23, 2022, by explicitly reiterating that the patch-repair method ordered by Defendants would not be effective and cited evidence from multiple sources supporting the same.

57.     On or about April 5, 2022, Defendants sent a letter doubling down on their assertion that the Property's roofs could be repaired. Defendants' letter is problematic for a number of reasons. Defendants first claimed that, under the Policy, the decision whether to repair or replace the lost or damaged property was solely in their discretion and cited Mr. Haney's questionable engineering report as the only evidence that the roofs could be spot repaired. Secondly, Defendants declined to address Plaintiff's January repair efforts, and, specifically, the fact that repair attempts caused collateral damage to the existing shingles on the roof. Finally, Defendants predicated their cooperation in settling the Claims on the Plaintiff sending the claim files from prior insurance carriers—files which were the sole property of other insurance companies, which the Plaintiff did not have copies of, and to which the Plaintiff had no legal ability to obtain without instituting litigation and sending subpoenas. Moreover, under the Policy, Defendants agreed to insure the Property in the condition it was in as of the effective date of the Policy. Defendants' insistence on reviewing prior insurance company's claim files is wholly irrelevant to Defendants' duty to return the Property to its pre-loss condition.

58.     Defendants' Assistant Vice President directly addressed Plaintiff on or about May 25, 2022, to again assert that the roofs could be spot repaired, and to continue its harassment of Plaintiff regarding the claim files from Plaintiff's prior insurers.

59.     To comply with Defendants' demand that Plaintiff obtain its own engineering report, Plaintiff's hired an expert engineer, Mr. Patrick Snowden with Orlo Forensics, to conduct a thorough inspection of the Property from June 20–22, 2022. Mr. Snowden published his findings

on or about July 28, 2022 (at which point they were provided to Defendants). A copy of Engineer Snowden's report is attached hereto as Exhibit I.

60.    At the outset, Engineer Snowden's report agrees with the Forensic Weather Consultants meteorological report that 1.00" hail and winds up to 25 miles per hour occurred on April 8, 2020, and that winds of up to 65 miles per hour affected the Property on April 13, 2020. Mr. Snowden then conducted a detailed mathematical analysis explaining why and how the hail created the impact marks found. Using these mathematical calculations—not his "own opinions"—Mr. Snowden concluded that the hailstorm on April 8, 2020 caused the damage to the Property.

61.    Engineer Snowden's report documents extensive hail damage to the Property that occurred during the April 8, 2020 storm.

62.    Engineer Snowden identified numerous fatal flaws with Engineer Haney's prior investigation and report:

    a. To begin, Mr. Haney was looking for spatter marks from a storm event that occurred over a year prior, making it unsurprising that none were present at the time of his inspection.

    b. Second, Mr. Haney was unable to identify hail damage to the window screens and wrote off any observed dents and tears as possible lawn-related damage. This is despite the fact that most instances of screen and window damage were observed on the second floor.

    c. Next, Mr. Haney relied on the CoreLogic estimates rather than actual physical data when making his weather evaluation and, in any event, did not account for wind

speed at the time of the hailstorm when concluding that the April 8, 2020 hail was too small to cause the observed damage.

d. Finally, Mr. Haney concluded that "it was evident that the direction of the storm, or at least, the larger hail had fallen primarily from the south and the west." This conclusion directly contradicts his position that the claimed damage occurred in the April 9, 2011, storm because the Forensic Weather Consultants report indicates that that storm impacted the Property from the Northwest.

63. Engineer Snowden's report explains at length why the Property's roofs cannot be spot repaired and why roof replacements are necessary. The Property has three-tab shingles on its roofs. Three-tab shingles are installed in such a way that each nail penetrates both the shingle being installed and the underlying course. Thus, *in order for any one shingle to be removed, the overlapping course must be removed as well*. What's more, existing nail holes cannot be reused, thus, two rows of unoccupied holes in the underlayment of the roof will be created if the shingles are replaced. Assuming four nails per shingle, a total of eight holes in the underlayment could be created with *every shingle repair*—creating an average of eighty (80) holes in the roof for every one hundred (100) square feet of the Property.

64. Further, each nail removed to replace the damaged shingles will create a new pathway for water entry, compromising the building's water shedding functionality.

65. Such a reality is particularly alarming when considering North Carolina State Building Code § 601.1 on conformance of repairs, which states in relevant part that "the work shall not make the building less conforming than it was before the repair was undertaken." Under § 502.1, repairs include patching or restoration or replacement of damaged materials.

HOWARD, STALLINGS, FROM, ATKINS, ANGELL & DAVIS, P.A.
Attorneys at Law
Raleigh, North Carolina

66. Creating thousands of new holes in the roofs while manipulating already brittle existing shingles in an attempt to repair the roof—Defendant's suggested course of action—would leave the Property in a less conforming state than it was before the repair was undertaken in direct violation of the North Carolina State Building Code.

67. Engineer Snowden concluded his report by stating "within a reasonable degree of engineering certainty, [] the April 8, 2020, storm event damaged the subject property" and recommended the following:

      a. "**Replacement** of the downspouts, gutters, and window screens damaged by the storm;"

      b. "**Replacement** of the roof appurtenances"; and

      c. "**Replacement** of the standing seam and asphalt shingle roof systems."

68. Engineer Snowden's report makes clear roof replacements are necessary and spot repairs will leave the Property worse-off than its pre-loss condition.

69. On or about September 13, 2022, at Defendants' direction, Engineer Haney produced yet another report to add to the conclusions from his previous two reports. Upon information and belief, the Defendants asked Engineer Haney to create this new report in an attempt to find ways it could still refuse to pay the Claims despite Engineer Snowden's sound and comprehensive investigation. The supplemental report is attached hereto as Exhibit J.

70. In the September 2022 supplemental report, Engineer Haney responds to Engineer Snowden's use of mathematics to support his conclusions. Haney "does not dispute that wind can increase a falling hailstone's terminal velocity. *However, just because [the] phenomena can be confirmed mathematically does not mean that it is actually what occurred on the DOL.*" At the

HOWARD, STALLINGS, FROM, ATKINS, ANGELL & DAVIS, P.A.
Attorneys at Law
Raleigh, North Carolina

very least, mathematic confirmation provides a better explanation of events than the pure conjecture that Engineer Haney has provided to date.

71.     In the September 2022 supplemental report, Engineer Haney further addresses why he believes spot repairs are possible. Engineer Haney took the trouble to contact the North Carolina Department of Insurance to confirm that "spot repair of individually damage[d] shingles is allowable." This conclusion is unsurprising, as Plaintiff has never claimed that the practice of spot repairing shingles is unallowable as a general practice. Rather, Plaintiff maintains that spot repairs would be unpermitted under the Building Code *here, on these roofs*, because the repair would leave the Property worse off than pre-repair, and also, that the collateral damage caused by spot repairs on these particular roofs makes spot repairs impossible. Haney neither confirms nor denies this sentiment and even "recommend[s] that repairs be performed with another third-party contractor in the presence of EFI and Orlo and/or Well Krafted Roofing" before making a final determination as to whether spot repairs are possible.

72.     Nevertheless, without attempting to perform these repairs to make ,a final determination on the appropriateness of spot repairs, on September 26, 2022, Defendants sent the letter that is attached hereto as Exhibit K, stating their position that spot repairs are possible and the appropriate mechanism of repair. Defendants further reiterate that they will not be making payment of the Claims. As a result, the Plaintiff was compelled to file the instant lawsuit.

73.     Without payment of the Claims, and as a result of Defendants' delay tactics and repeated, and unreasonable denials, Plaintiff incurred, and will continue to incur, significant expenses in mitigating its damages, attorney's fees, litigation costs, and other expenses and damages.

74. At all times, Plaintiff made itself and the Property available to Defendants, their agents, and their representatives and fully cooperated with Defendants, their agents, and their representatives to inspect and investigate the damage caused by hail and wind.

75. Defendants have failed to provide a reasonable basis for their failure to pay the Claims or for their protracted investigation and unreasonable positions taken in the adjustment of the Claims.

76. At all times throughout the investigation of the Claims, Plaintiff complied as promptly as possible with every request made by Defendants for information regarding the Claims and have otherwise fulfilled all conditions precedent and contractual obligations under the Policy prior to the filing of this lawsuit.

77. Plaintiff repeatedly provided all information and documentation relevant to Plaintiff's contention that roof replacements are necessary and covered under the Policy. Such information was not provided reasonable consideration by Defendants. As such, Plaintiff continued to expend time, energy, and resources to provide estimates, expert reports, and further information in support of the Claims. However, in reality, Defendants had no interest in reviewing new facts or information, and they did not in fact consider any additional documents or information provided by Plaintiff.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**

78. Plaintiff realleges and incorporates the preceding allegations as if set forth verbatim herein.

79. The Policy is and was a valid and enforceable contract between Plaintiff and Defendants.

80. Defendants breached this contract by failing to provide the benefits, coverages and payments due thereunder to Plaintiff.

81. As a direct and proximate result of Defendants' breach of contract, Plaintiff has suffered monetary damages in an amount equal to the payments due under the Policy, as well as consequential, ensuing and other forms of damages as may be proven at trial.

82. Plaintiff's damages are in excess of this Court's jurisdictional threshold of Twenty-Five Thousand Dollars ($25,000.00).

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing

83. Plaintiff realleges and incorporates the preceding allegations as if fully set forth herein.

84. The Defendants' conduct alleged herein was in bad faith and in violation of the covenant of good faith and fair dealing implied by law into the Policy.

85. Specifically, the Defendants (1) refused to pay the full amount of the loss after recognition of a valid claim, (2) engaged in bad faith through wrongful purpose or intent to save money under its coverages, and (3) engaged in aggravating conduct, through evidencing a reckless and wanton disregard of Plaintiff's rights under the Policy as detailed herein.

86. As a proximate result of the Defendants' bad faith breach of the contract, Plaintiff is entitled to recover punitive damages from the Defendants for the above-described conduct, which was willful and wanton, in the maximum amount permitted by law.

### THIRD CLAIM FOR RELIEF
**Unfair Claims Settlement Practices**
**And Unfair & Deceptive Trade Practices**

87.     Plaintiff realleges and incorporates the preceding allegations as if fully set forth herein.

88.     Upon information and belief, the conduct of Defendants constitutes unfair claims settlement practices that violate one or more of the subparts of N.C.G.S. § 58-63-15(11), and Unfair & Deceptive Trade Practices in violation of Chapter 75 of the North Carolina General Statutes, including, but not limited to:

   a.  Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

   b.  Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

   c.  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

   d.  Refusing to pay claims without conducting a reasonable investigation based upon all available information;

   e.  Failing to affirm or deny coverage of claims within a reasonable time after proof-of-loss statements have been completed;

   f.  Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

   g.  Compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amount actually due to such insured;

---

h. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

i. Purposely failing to act in good faith to effectuate prompt, fair, and equitable settlement of the Claim in which liability had become reasonably clear based on the estimates, reports, and other evidence provided by Plaintiff at the request and invitation of the Defendants;

j. Intentionally refusing to review or consider the significant amount of evidence regarding the extent of damage to the Property and the value of the Claims provided by Plaintiff or to incorporate such evidence into its adjustment of the Claims, despite repeatedly and expressly informing Plaintiff that it would do so;

k. Ignoring the Sworn Proof of Loss Statement provided by the Plaintiff and the expert reports and detailed repair estimates provided contemporaneous and subsequent thereto;

l. Failing to provide any explanation or communication to Plaintiff regarding why the evidence provided by Plaintiff and its own expert was insufficient to alter Defendant's denial of Plaintiff's Claim, despite the fact that such evidence overwhelmingly showed that the Property's roofs must be replaced rather than spot repaired and that such replacement was covered by the Policy; and

m. Other particulars as will be adduced through further investigation, discovery, or at trial.

89. More particularly, with Defendants' actual and/or constructive knowledge of Plaintiff's damages and coverage therefore, Defendants unfairly and unlawfully failed to promptly

investigate, adjust and pay the Claims in violation of North Carolina law, N.C.G.S. § 58-63, and Chapter 75 of the North Carolina General Statutes. The factually specific statutory violations, in part, are outlined above and said violations, in part, correspond to violations of provisions of North Carolina law found from N.C.G.S. § 58-63-15(11)(a) through N.C.G.S. § 58-63-15(11)(n).

90.     Defendants' above-described conduct, in violation of N.C.G.S. § 58-63-15(11), is a per se violation of N.C.G.S. § 75-1.1.

91.     The conduct of the Defendants directly violates N.C.G.S. § 75-1.1 in that their acts were unfair, unscrupulous, immoral, deceptive, oppressive, and substantially injurious to Plaintiff and was an inequitable assertion of their power and position over Plaintiff under the circumstances.

92.     Defendants' unfair and deceptive trade acts or practices were in or affecting commerce.

93.     As a proximate result of Defendants' unfair claim settlement practices and unfair and deceptive trade acts and practices, Plaintiff has suffered damages in an amount equal to the benefits currently due under the Policy as well as additional damages to be proven at trial.

94.     Pursuant to N.C.G.S. § 75-16, Plaintiff is entitled to treble its damages.

95.     Pursuant to N.C.G.S. § 75-16.1, Plaintiff is entitled to an award of reasonable attorney's fees.

96.     Plaintiff's damages are not presently fully capable of admeasurement, but in any event far exceed this Court's jurisdictional threshold of $25,000.

**WHEREFORE**, Plaintiff prays that the Court enter Judgment as follows:

1.  That Plaintiff has and recover of Defendants, jointly and severally, a sum equal to the amount of benefits due under the Policy, currently $7,662,693.30, as well as

**HOWARD, STALLINGS, FROM, ATKINS, ANGELL & DAVIS, P.A.**
Attorneys at Law
Raleigh, North Carolina

consequential, incidental, compensatory, and other contractual damages to be proven at trial;

2. That Plaintiff be awarded treble its damages as provided by N.C.G.S. §§ 75-1.1 and 75-16, or at Plaintiff's election, punitive damages;

3. That the Court tax prejudgment interest on the award and post judgment interest on the entire judgment as permitted by law;

4. That the Court tax the costs of this action, including Plaintiff's attorney's fees as provided by the common law and the North Carolina General Statutes, including but not limited to Chapter 75 and 58 thereof, against Defendants;

5. That all issues of fact be tried by a jury; and

6. That Plaintiff has such other and further relief as the Court may deem just and proper.

This the 5th day of October, 2022.

> **HOWARD, STALLINGS, FROM,**
> **ATKINS, ANGELL & DAVIS, P.A.**
>
> By: _Robert Jessup_
>
> Robert H. Jessup (State Bar No. 42945)
> Post Office Box 12347
> Raleigh, North Carolina 27607
> Telephone: (919) 821-7700
> rjessup@hsfh.com
> *Attorney for Plaintiff*



1

EXHIBITS to COMPLAINT
22CVS18146 Mecklenburg Co.
Blakeney Preserve HOA v.
The Hanover American Ins.



7022 0410 0002 2801 1080



NC DEPARTMENT OF
★iNSURANCE

1201 Mail Service Center
Raleigh, NC 27699-1201

Hanover Insurance Company, The
440 Lincoln Street
Worcester, MA 01653