## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:22-cv-00645-RJC-DCK

| | | |
|---|---|---|
| BLAKENEY PRESERVE HOMEOWNERS ASSOCIATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER** |
| THE HANOVER AMERICAN INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on Defendant The Hanover American Insurance Company's Motion for Summary Judgment, (Doc. No. 31), and Motion for New Trial, (Doc. No. 55), seeking a new trial date of August, 12, 2024, or some later date pending this Order's issuance. For the reasons explained below, Defendant's Motion for Summary Judgment, (Doc. No. 31), is **GRANTED**, and Defendant's Motion for New Trial, (Doc. No. 55), is **DENIED**.

## I.    BACKGROUND

Plaintiff Blakeney Preserve Homeowners Association, Inc. is a Charlotte-based homeowners' association consisting of 43 condominium buildings. Defendant The Hanover American Insurance Company insured Plaintiff under policy ZZ6 D646850 01,[1] effective July 1, 2019, to July 1, 2020. (Doc. No. 1-2).

───────────────

[1] The policy includes commercial property coverage on the community's structures subject to a $41,484,090 blanket limit of insurance and a $5,000 per occurrence

1

In April 2020, two independent storm events – an April 8 hailstorm and April 13 wind gusts – caused damage to Plaintiff's property. Following the storm events, Plaintiff initiated a drone assessment indicating significant damage to the property's roofs. (Doc. No. 36-1 at 89:1–92:2). Despite performing repairs in response to thirteen different reports of leaks and damage throughout the community, Plaintiff reported to Defendant only three claims for damage to specific units in 2020. (*Id.* at 33:8–34:20, 36:5–37:14, 37:17–38:11, 44:9–16). Plaintiff later consulted a roofing contractor which encouraged it to retain a public adjuster and to submit a claim for replacement of all of the property's roofs. (*Id.* at 33:8–34:20, 123:8–124:20). Nearly a year later, on March 10, 2021, Plaintiff reported the damage to Defendant. (*Id.* at 37:5–10; Doc. No. 33 at ¶ 3; Doc. No. 33-1).

Defendant retained S&S Claims Service to inspect the reported damage, which assigned the claim to Fred Young. (Doc. No. 36-2 at 102:24–103:19). Despite being assigned the claim on March 10, 2021, Young's first inspection did not occur until April 6, 2021. (Doc. No. 38-1, Pl's Ex. 10 at 81). After Young's second inspection of the property, Defendant became concerned about Young's ability to timely investigate the loss given his trouble scheduling inspections with Plaintiff's adjuster, Curtis Eaton. (Doc. No. 36-3 at 207:10–209:2). Defendant was also concerned by Young's suggestion that it use the inspected portions of the property as exemplars to estimate damage throughout the community – rather than individually inspecting each structure. (*Id.*).

---

deductible applicable to wind and hail. The policy provides for replacement cost coverage if the insured submits proof of actual completion of repairs or reconstruction to recover depreciation. (Doc. No. 1-2 at 9–10).

2

Eaton's report indicates that during Young's investigation, Young rubbed off chalk used by roofers to denote hail damage, refused to recognize obvious damage, and made disparaging remarks. (Doc. No. 38-1, Pl's Ex. 10 at 81–82).

Given its concerns, in April 2021, Defendant reassigned the claim to Engle Martin, a firm it generally used for wider scale losses. Unaware of the details surrounding the claim's transfer, Engle Martin started the claim investigation anew. (*Id.* at 122:9–12). Engle Martin's Jeremy Higgins inspected Plaintiff's property during May and June 2021. (Doc. No. 33-2). In a July 2, 2021 report, Higgins recommended that Defendant retain a structural engineer or roofing consultant to determine whether a covered cause of loss had occurred and whether total replacement or partial repairs were warranted. (*Id.* at 4). Before Defendant had done so, on July 26, 2021, Eaton submitted a partial estimate and demand for payment in excess of $2.6 million. (Doc. No. 33-3 at 112). Because Eaton's demand exceeded the threshold for claims to be adjusted by Defendant's large loss team, on August 2, 2021, Defendant elevated the claim to its large loss unit and reassigned it to Jacques Lemerand. (Doc. No. 36-2 at 154:1–7; Doc. No. 36-3 at 209:20–210:17).

Lemerand retained an engineer to evaluate the cause and origin of the losses, building consultants to prepare estimates for any necessary repairs, and forensic weather consultants to evaluate weather conditions that may have affected the property during the policy period. (Doc. No. 36-4 at 37:15–19, 38:2–5, 38:12–15). At the time Defendant retained engineer Nathaniel Haney of EFI Global, Haney had less than eight months of experience as a licensed engineer and did not have any

3

formal training in roof construction or repairs. (Doc. No. 38-5 at 84:12–89:18). While Haney lacked specific experience as a roofer, he had held two prior engineering jobs and had more than five years of experience in forensic evaluations of damaged structures, including roofs. (*Id.* at 51:20–55:11, 60:13–62:4). Defendant's consultants, John Schneider and Trevor Hackworth of inLine Consulting and Robby Webb of BluSky Restoration Contractors, similarly lacked specific roofing experience. (Doc. No. 38-3 at 17:23–18:4, 24:23–25:15). Defendant selected Haney, Schneider, Hackworth, and Webb from a pre-approved vendor list created by its upper management; Defendant's consultants receive upwards of 80–90% of their work from insurance companies. (Doc. No. 38-1 at 140:8–18, 141:3–11, 225:11–12; Doc. No. 38-4 at 38:16–39:3; Doc. No. 38-5 at 71:4–7).

Defendant's engineer inspected the property in August and November 2021. (Doc. No. 36-5 at 114:19–23, 191:5–14, 195:5–9). Haney concluded in an August 20, 2021 report that the storm events caused damage to Plaintiff's property, and he submitted that the damage could be repaired. (Doc. No. 33-4 at 12–13). Haney determined that full roof replacement was not warranted given the observed damage and pre-loss condition of the roofs. (*Id.*). Haney reasoned that individual shingle replacement was considered possible for all of the hail- and wind-related damage observed along the roofing surfaces. (*Id.*). Before its investigation was complete, on August 24, 2021, Defendant rejected Plaintiff's proof of loss by letter for reasons including its continued investigation into a covered event occurring within the policy period and not having

4

yet reached a determination.[2] (Doc. No. 33-5). At Lemerand's request, Haney issued an amended report to include additional analysis of wind damage in relation to building code design speeds on August 25, 2021; the report was re-issued without substantive changes on November 22, 2021. (Doc. No. 33-4 at 42:19–43:9). Following his November 2021 re-inspection of Plaintiff's property, Haney issued another supplemental report. (Doc. No. 33-8).

Defendant relied on Haney's opinion in concluding that the roofs were repairable. (Doc. No. 36-4 at 69:20–70:6). Based on that conclusion, Defendant's consultants, John Schnieder and Trevor Hackworth of inLine Consulting, prepared estimates for the cost of repairs attributable to each storm event. InLine estimated repairs to Plaintiff's property for hail-caused damage at replacement cost value of $413,876.92 with $31,136.08 of recoverable depreciation. (Doc. No. 33-9 at 80). The hail estimate also included repairs to other elements of the property, including gutters, downspouts, and metal roofing. (*Id.*). InLine estimated that wind caused damage at replacement cost value of $45,759.61 with no depreciation assessed. (Doc. No. 33-10 at 25).

Based on inLine's estimates, on November 18, 2021, Defendant tendered two undisputed claim payments to Plaintiff concurrent with a letter indicating that it determined there was coverage for the wind and hail damage only to the extent of repairs. (Doc. No. 1-1 at ¶ 48; Doc. No. 33-11 at 3; Doc. No. 33-12 at 2). Defendant

_____

[2] Defendant acknowledges that a proof of loss letter would typically be held in abeyance when further investigation is required. (Doc. No. 38-1 at 173:1–175:15).

first tendered a payment of $377,740.84 for hail damage. (Doc. No. 1-1 at ¶ 48; Doc. No. 33-11). The payment accounted for Defendant's replacement cost estimate for repairs, less the $31,136.08 of recoverable depreciation and the policy's $5,000 hail deductible. (*Id.*). Defendant next tendered a payment of $40,759.61, which represented Defendant's estimate for repairs for wind damage less the policy's $5,000 wind deductible. (Doc. No. 1-1 at ¶ 48; Doc. No. 33-12).

Defendant then retained BluSky Restoration Contractors to evaluate its estimate and proposed repair methodology. (Doc. No. 36-4 at 72:22–73:3). Lemerand informed Plaintiff that BluSky was evaluating only the viability of the scope and pricing that had been provided to Defendant. (Doc. No. 33-13 at 2). Despite utilizing a different price list and not including reductions for Defendant's policy's deductibles (resulting in slight increases to the amount of its estimates), BluSky concluded that inLine's estimates for repairs represented a reasonable price for the scope of work. (Doc. No. 33-14–15).

Plaintiff disagreed with Defendant's conclusion that repairs were appropriate to remedy the damage. On February 28, 2022, Eaton submitted a revised estimate and demand totaling $7.6 million. (Doc. No. 33-17). The new demand included Eaton's previous shingle roof estimate and additionally included estimates for replacement of the property's metal roofing systems, sheathing, gutters, downspouts, and fascia. (*Id.*). In addition, Plaintiff submitted opinions and evidence from a roofing company, Well-Krafted Roofing, that spot repairs would cause cascading collateral damage to the roofing system and that spot repairs were not otherwise possible. (*Id.* at 14–53).

6

Plaintiff provided a video of an attempt to complete repairs to individual shingles, a report demonstrating that the make and model of shingles used on the property's roofs were no longer in production, and a manufacturer announcement recommending that the type of shingle used on the property's roofs not be mixed with other shingle types.[3] (Doc. No. 33-17; 38-1 at 82:11–83:17).

On March 9, 2022, Lemerand responded to Eaton's submissions, indicating that Defendant's consultants had previously assessed that a covered loss had occurred, evaluated the extent of damage at the property, analyzed appropriate repair methodologies, and estimated the cost of necessary repairs. (Doc. No. 33-18). On that basis, Defendant rejected Plaintiff's demand and declined to pay the $7.6 million. (*Id.*). Defendant then requested from Plaintiff: (1) copies of claim files from Plaintiff's previous insurance claims from 2010 to the present, (2) its engineer's report supporting its position that replacement was the only viable repair methodology, and (3) copies of repair invoices and reports in relation to all roof repairs from 2010 to the present. (*Id.* at 3).

Plaintiff then retained engineer Patrick Snowden to assess repairability of its roofing systems. Snowden inspected Plaintiff's property in June 2022 and prepared a report detailing his opinion that full replacement of all of the property's roofs was

---

[3] While Lemerand testified that he believed he had provided Plaintiff's failed spot repair video to Haney, Haney never actually viewed the video. (Doc. No. 38-5 at 229:13–230:5). Lemerand testified that he provided the video to inLine for its review, and inLine recalled reviewing the video. Defendant did not take a position at its 30(b)(6) deposition as to whether Lemerand provided the video to Haney. (Doc. No. 38-1 at 83:1–15).

7

necessary. (Doc. No. 38-7, Snowden Ex. 5). Snowden relied on the brittleness of the shingles, the applicable building codes, and the fact that attempted spot repairs would result in thousands of direct pathways for water entry and cascading damages. (Doc. No. 38-7 at 102:9–112:25; Snowden Ex. 5). On August 11, 2022, Plaintiff provided Snowden's report to Lemerand. (Doc. No. 33-20).

On September 13, 2022, Haney provided a supplemental report to Lemerand. (Doc. No. 33-23). Haney stood by his conclusion that the property's roofs were repairable based on his inspections and interpretation of the authorities Snowden cited in his report. (*Id.*). In a September 26, 2022 letter to Plaintiff, Lemerand provided Haney's supplemental report and indicated that Defendant maintained its coverage position. (Doc. No. 33-24).

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

8

477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

## III. DISCUSSION

Defendant seeks summary judgment on Plaintiff's claims for breach of the covenant of good faith and fair dealing and unfair and deceptive trade practices and acts pursuant to N.C.G.S. § 75-1.1.

9

### a. Breach of the Covenant of Good Faith and Fair Dealing

"Under North Carolina law, every contract contains 'an implied covenant of good faith and fair dealing.'" *Wake Chapel Church, Inc. v. Church Mut. Ins. Co.*, 2023 U.S. Dist. LEXIS 198249, at *36 (E.D.N.C. Sept. 21, 2023) (quotations omitted). In the insurance context, North Carolina law recognizes a tort for bad-faith refusal by an insurance company to settle a claim. *See Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 420, *aff'd*, 334 N.C. 682 (1993). "To establish a claim for bad faith refusal to settle, [a plaintiff] must show: (1) 'a refusal to pay after recognition of a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct.'" *Topsail Reef Homeowners Ass'n v. Zurich Specialties London, LTD*, 11 F. App'x 225, 237 (4th Cir. 2001) (quoting *Lovell*, 108 N.C. App. at 420, 424 S.E.2d at 184).

The insurer must recognize the entirety of the insured's claim as valid to be subjected to liability. *Barnett v. State Auto Prop. & Cas. Ins. Co.*, 2015 U.S. Dist. LEXIS 7193, at *6–7 (W.D.N.C. Jan. 22, 2015). "The fact that [an insurer pays] a portion of [an insured's] claim while disputing the remainder of the claim is insufficient to establish that [the insurer] recognized the entirety of the claim for purposes of alleging a bad faith claim." *Id.* at 7 (citations omitted); *see also Blis Day Spa, LLC v. Hartford Ins. Grp.*, 427 F. Supp. 2d 621, 632–33 (W.D.N.C. 2006) (holding that the insurer was entitled to summary judgment given that it never recognized the validity of the disputed portions of the insured's claim and paid all undisputed amounts).

10

"Bad faith means 'not based on honest disagreement or innocent mistake.'" *Topsail Reef Homeowners Ass'n*, 11 F. App'x at 239 (quoting *Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 396, 331 S.E.2d 148, 155). "As was established in *Olive v. Great American Ins. Co.*, when an insurer denies a claim because of a legitimate, 'honest disagreement' as to the validity of the claim, the insurer is entitled to judgment as a matter of law because the plaintiff cannot establish bad faith or any tortious conduct on the part of the insurer." *Id.* at 239. "Aggravated conduct is defined to include 'fraud, malice, gross negligence, insult . . . willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights.'" *Id.*

Having reviewed the parties' arguments and the record, the Court finds there is no evidence that Defendant ever recognized as valid the disputed portions of Plaintiff's claim but nevertheless chose not to pay. Rather, the undisputed evidence demonstrates the opposite: Defendant tendered two claim payments to Plaintiff simultaneous with a letter detailing its claim position. Defendant recognized Plaintiff's claim only to the extent of repairs, not of replacement. Relying on its engineer's repairability assessment and its consultants' cost estimates, Defendant maintained and communicated its coverage position to Plaintiff throughout the entirety of its claim investigation process. The undisputed record makes clear that Defendant deemed a large portion of Plaintiff's claim invalid given its position that repairs were feasible.

11

In support of its argument that Defendant "knew" that the roofs needed to be replaced, Plaintiff cites to a recorded conversation (and underwriting note) between Lemerand and an underwriter, Amy Campbell, in which Lemerand told his colleague that he knew "the roofs need[ed] to be replaced and not repaired." (Doc. No. 38-1 at 89:16–90:25, 92:6–10). But Lemerand's statement cannot be read in a vacuum. The Court finds that Plaintiff's argument is undermined by Defendant's apparent differentiation between its view that the damage from the storm events could be repaired and its view that the overall age of the roofs merited their replacement.

Indeed, one of Lemerand's direct managers, Tamara Weber, clarified in her deposition testimony that Lemerand "did not believe that the roofs needed to be replaced, because of the wind and hail damage. He believed they needed to be replaced, because of the age, overall age of the roofs, but he felt that they could be, that the wind and hail damages could be repaired." (*Id.* at 90:13–19). And the underwriting note in question specifies that such replacement should not be made at Defendant's expense. (Doc. No. 38-1, Ex. 9 at 79–80) (April 18, 2022 underwriting note stating that the "roofs need to be replaced, not repaired (not at our expense)").

Plaintiff further points to Lemerand procuring an estimate in excess of $1.5 million for total shingle replacement as evidence that Defendant recognized the entirety of Plaintiff's claim as valid but nevertheless chose not to pay. But the undisputed evidence demonstrates that Lemerand obtained the total shingle replacement estimate as a routine part of his investigation and in response to Plaintiff's demand. Lemerand's written testimony confirms that "[Defendant] never

agreed to the scope of repairs as detailed in [the] estimate and [the estimate] never formed the basis for any payment or represented an undisputed amount of loss." (Doc. No. 33 at ¶ 23; Doc. No. 33-21).

While Plaintiff submits a number of other acts that allegedly establish that Defendant recognized the entirety of Plaintiff's claim as valid but nevertheless chose not to pay (i.e., "Defendant's use and selection of wholly unqualified experts in roofing with obvious bias," "Defendant allegedly withholding evidence, specifically the failed spot repair video from Haney," "Defendant refusing to impartially consider the report from Snowden," and "Defendant's factual admissions about the condition of the roofs"), the Court finds each unavailing. Plaintiff's remaining arguments consist of conclusory statements that require significant "inferential leaps . . . as to what a jury *might* find." *DAG Petroleum Suppliers, LLC v. BP, PLC*, 268 F. App'x 236, 242 (4th Cir. 2008) (emphasis in original) (quotations omitted). The undisputed record fails to support a reasonable finding that Defendant recognized the entirety of Plaintiff's claim as valid but nevertheless chose not to pay.

The Court need not reach the remaining elements but finds that Plaintiff has failed to demonstrate that Defendant's refusal to pay the entirety of the claim was not because of a legitimate, "honest" disagreement as to the claim's validity. *See Olive v. Great American Ins. Co.*, 76 N.C. App. 180, 333 S.E.2d 41 (1985) (when an insurer denies a claim because of a legitimate, "honest disagreement" as to the claim's validity, the insurer is entitled to judgment as a matter of law because the plaintiff cannot establish bad faith or any tortious conduct on the part of the insurer). Nor has

13

Plaintiff identified any aggravating conduct. Thus, the Court grants summary judgment in favor of Defendant as to Plaintiff's claim for breach of the covenant and good faith and fair dealing.

### b. Unfair and Deceptive Trade Practices and Acts Pursuant to N.C.G.S. § 75-1.1

To establish a claim under N.C.G.S. § 75-1.1, a complainant must show: (1) that the defendant committed an unfair or deceptive act or practice; (2) that the action in question was in or affecting commerce; and (3) that the act proximately caused injury to the plaintiff. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "Whether an insurer's conduct reflects an unfair or deceptive practice is a question of law." *DENC, LLC v. Philadelphia Indem. Ins. Co.*, 32 F.4th 38, 50 (4th Cir. 2022) (citations omitted).

Commission of any of the unfair claims practices detailed at N.C.G.S. § 58-63-15(11) constitutes per se unfair and deceptive trade practices for purposes of such an action. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 71, 529 S.E.2d 676, 682–83 (2000). "[A] plaintiff who sufficiently alleges conduct which violates [§ 58-63-15(11)] satisfies the first and second elements, but it must nonetheless sufficiently allege that the violation . . . was the proximate cause [o]f its injury." *Cornerstone Assembly of God, Inc. v. Bhd. Mut. Ins. Co.*, No. 4:22-CV-122-BO-KS, 2023 U.S. Dist. LEXIS 113864, at *7 (E.D.N.C. June 30, 2023). Unlike with a claim directly under N.C.G.S. § 58-63-15(11) by the Commissioner of Insurance, it "[is] unnecessary to determine whether [a plaintiff has] established that the acts occurred with such frequency as to constitute a general business practice," but rather that one occurred

only in a single instance. *Country Club of Johnston Cnty., Inc. v. U.S. Fid. Guar. Co.*, 150 N.C. App. 231, 244, 563 S.E.2d 269, 278 (2002).

Plaintiff alleges that several per se violations under N.C.G.S. § 58-63-15(11) preclude a finding of summary judgment at this stage, including:

- N.C.G.S. § 58-63-15(11)(c): "Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies,"

- N.C.G.S. § 58-63-15(11)(d): "Refusing to pay claims without conducting a reasonable investigation based upon all available information,"

- N.C.G.S. § 58-63-15(11)(f): "Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear,"

- N.C.G.S. § 58-63-15(11)(g): "Compelling the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured," and

- N.C.G.S. § 58-63-15(11)(h): "Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled."

(Doc. No. 38 at 23).

Plaintiff further contends that a reasonable juror could also find from the evidence that Defendant's conduct was "unfair and deceptive" from more "general conduct," which caused injury to Plaintiff. (*Id.* at 25). As discussed below, the Court finds that the evidence with respect to each of Plaintiff's allegations fails to support a reasonable finding that Defendant's actions in handling Plaintiff's claim were in any way "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Gray*, 352 N.C. at 68–71, 529 S.E.2d at 683.

15

### i. N.C. Gen. Stat. § 58-63-15(11)(c)

Plaintiff argues that by self-admission, Defendant has not adopted and implemented any standards for the prompt investigation of claims in violation of N.C. Gen. Stat. § 58-63-15(11)(c). (*Id.* at 23–24). Specifically, Plaintiff contends that Defendant "definitively had no claims handling standards whatsoever that governed Lemerand or its large loss group, nor any to vet and control the behaviors of its independent adjusters." (*Id.*).

"What constitutes a reasonable standard [under § 58-63-15(11)(c)] 'is usually evaluated in light of all the facts and circumstances surrounding the act or decision at issue.'" *Wake Chapel Church, Inc.*, 2023 U.S. Dist. LEXIS 198249, at *31 (quotations omitted). "Reasonable, however, 'does not mean perfect or the best practice.'" *Id.* "The fact that an insurer's process 'is not perfect or could be more accurate does not mean that it is not reasonable.'" *Id.* The court in *Wake Chapel Church, Inc.* observed that "[a]t least one court has found that it 'seems unlikely that the mere failure to follow established procedures, without more, would contravene Section 58-63-15(11)(c), given that the [unfair claim settlement practices statute] appears focused on systemic issues in handling insurance claims.'" *Id.* (citing *Whitworth v. Nationwide Mut. Ins. Co.*, 2018 U.S. Dist. LEXIS 159900, at *20 (M.D.N.C. Sept. 19, 2018)).

Here, no evidence exists to support a reasonable finding that Defendant failed to adopt or implement reasonable standards for the prompt investigation of claims. While Defendant testified that it maintains no written standards or manuals applicable to large loss adjusters, (Doc. No. 36-3 at 212:21–213:17), Defendant

16

confirmed the existence of a written best practices manual attributable to its core claim group – where the claim originated. (*Id.*). The record further demonstrates that Defendant's large loss team – where the claim was transferred – is governed by state fair claim practices dictated by the location of the loss. (*Id.*).

Regardless of the written standards Defendant maintains, the undisputed record fails to support a reasonable finding that Defendant failed to adopt or implement reasonable standards for the prompt investigation of claims in this case. To the contrary, the evidence demonstrates that Defendant terminated S&S Claims Service because its investigation was proceeding too slowly. And Defendant scrutinized S&S Claims Service's adjuster's approach to investigating Plaintiff's claim, acting when it disagreed with his recommendations. Further, Defendant responded promptly to Plaintiff's communications – including its demands and its own expert's report. Thus, summary judgment in favor of Defendant is warranted as to Plaintiff's unfair and deceptive trade practices claim under subchapter (c).

### ii. N.C. Gen. Stat. § 58-63-15(11)(d)

Plaintiff alleges that Defendant violated N.C. Gen. Stat. § 58-63-15(11)(d) by failing to conduct "a reasonable investigation based upon all available information" of Plaintiff's claims, specifically, including but not limited to:

- (1) its 4- or 5-month delay in performing any substantive claim investigation after Plaintiff made the claims, including the conduct of its adjusters during this time,

- (2) Lemerand's use of pre-selected, wholly unqualified "experts" in roofing, with obvious bias and loyalty toward insurance companies,

- (3) withholding evidence, specifically the failed "spot repair" video, from the "expert" which showed the roofs needed to be replaced,

- (4) refusing to consider the report from Snowden indicating roof replacement was necessary for no other purported reason than Defendant wasn't paying him, even after it requested the insured obtain an engineer's report, and

- (5) factual admissions by Defendant's designee about the condition of the roofs, the roofing components, and what was required to be done on the roofs to address the damages.

(Doc. No. 38 at 24).

"An investigation may be unreasonable if the investigators were 'incompetent or untrustworthy.'" *Lifebrite Hosp. Grp. of Stokes, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 1:22-cv-849, 2023 U.S. Dist. LEXIS 169685, at *12 (M.D.N.C. Sep. 22, 2023) (citing *DENC, LLC v. Phila. Indem. Ins. Co.*, 426 F. Supp. 3d 151, 158 (M.D.N.C. 2019), *aff'd*, 32 F.4th 38 (4th Cir. 2022) (granting summary judgment in favor of defendant insurer on § 58-63-15(11)(d) claim after finding there was nothing in the record "to indicate, for example, that the investigators were incompetent or untrustworthy")). "An investigation that is 'unscrupulous,' 'unethical,' or 'deceive[s]' may also be unreasonable." *Id.* (citing *Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 612, 630 S.E.2d 221, 233 (granting summary judgment in favor of defendant insurer on § 58-63-15(11)(d) claim)).

For the reasons already explained, the Court finds that the undisputed record fails to demonstrate that Defendant conducted an unreasonable investigation into Plaintiff's claim. While Plaintiff summarily challenges the credibility of Defendant's consultants and the merit of its investigation, the evidence fails to support a reasonable finding that the experts and consultants Defendant relied on were incompetent or untrustworthy. That Plaintiff disagrees with Defendant's process or

18

outcome is insufficient to create an evidentiary basis from which a reasonable juror could find a violation of N.C. Gen. Stat. § 58-63-15(11)(d). Thus, summary judgment in favor of Defendant is warranted as to Plaintiff's unfair and deceptive trade practices claim under subchapter (d).

### iii. N.C. Gen. Stat. § 58-63-15(11)(f)–(h)

Plaintiff's remaining UDTPA claims fail for the reasons already explained and because Defendant's liability under the policy has not yet been established. Each of Plaintiff's remaining arguments hinge on Defendant's purported knowledge that the roofs needed to be replaced.

Plaintiff contends that "[a] reasonable juror could find from the evidence that Defendant violated N.C. Gen. Stat. § 58-63-15(11)(f) by failing to attempt in good faith to effectuate prompt, fair, and equitable settlement of Plaintiff's claims for replacement of the roofs, even though it knew the roofs needed to be replaced." (Doc. No. 38 at 24). But Plaintiff must allege "that the insurer's liability is reasonably clear to plead an unfair and deceptive trade practice under subsection (f). A mere disputed claim is not sufficient." *Neshat v. Nationwide Mut. Fire Ins. Co.*, No. 5:20-CV-664-D, 2021 U.S. Dist. LEXIS 100154, at *4, *8 (E.D.N.C. May 27, 2021) (citations omitted); *see also Williams v. Ohio Nat'l Life Assurance Co.*, 364 F. Supp. 3d 605, 614 (W.D.N.C. 2019). As discussed, Plaintiff's claim remains reasonably in dispute (and thus, liability has not yet become reasonably clear). Licensed experts disagree about the scope of Plaintiff's claim. And in reliance on its engineer and consultants, the undisputed record makes clear that Defendant recognized Plaintiff's claim only to the

extent of repairs. Therefore, Defendant is entitled to summary judgment on Plaintiff's unfair and deceptive trade practices claim under subchapter (f).

Plaintiff further argues that "a reasonable juror could also find from the evidence that Defendant violated N.C. Gen. Stat. § 58-63-15(11)(g) by compelling the insured to institute litigation for replacement of its roofs, after Defendant knew the roofs were covered and needed to be replaced." (Doc. No. 38 at 24). But "[t]he United States Court of Appeals for the Fourth Circuit has determined that claims under this subsection are premature when brought before 'liability [has] been determined.'" *Jones v. Crum & Forster Specialty Ins. Co.*, No. 7:22-CV-025-FL, 2023 U.S. Dist. LEXIS 170716, at *28–29 (E.D.N.C. Sept. 25, 2023) (quoting *Elliott v. American States Ins. Co.*, 883 F.3d 384, 398 (4th Cir. 2018)). Thus, for the same reason, Defendant is entitled to summary judgment on Plaintiff's unfair and deceptive trade practices claim under subchapter (g).

Last, Plaintiff argues that "a reasonable juror could find from the evidence that Defendant violated N.C. Gen. Stat. § 58-63-15(11)(h) by attempting to settle the Plaintiff's claims for its purported approximately $400,000 of 'spot repairs,' when it knew that roof replacement was owed, which costs millions of dollars more." (Doc. No. 38 at 25). But "[w]here liability has not been conclusively determined, it cannot be said that a reasonable person would believe himself entitled to either the maximum coverage provided under the policy, or the amount ultimately recovered, before the fact or amount of liability had been determined." *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, No. 2:14-CV-08-FL, 2022 U.S. Dist. LEXIS 179769, at *51 (E.D.N.C. Sept.

30, 2022) (citing *Elliott*, 883 F.3d at 398–99). The undisputed record fails to support a reasonable finding that Defendant failed to consider settlement of the claim in good faith. Thus, Defendant is entitled to summary judgment on Plaintiff's unfair and deceptive trade practices claim under subchapter (h).

The Court finds that the undisputed record fails to support a reasonable finding that Defendant committed an unfair or deceptive act or practice – either through per se violations of N.C.G.S. § 58-63-15(11) or more general conduct – which caused injury to Plaintiff. Thus, the Court grants summary judgment in favor of Defendant on Plaintiff's claims for unfair and deceptive trade practices and acts pursuant to N.C.G.S. § 75-1.1.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

(1) Defendant's Motion for Summary Judgment, (Doc. No. 31), is **GRANTED**;

(2) Defendant's Motion for New Trial, (Doc. No. 55), is **DENIED**;

(3) The jury trial in this matter is **SET** for July 8, 2024, at 9:00 AM in Courtroom #4A, 401 West Trade St., Charlotte, North Carolina 28204;

(4) Plaintiff and Defendant shall file final witness and exhibit lists no later than **Friday, June 14, 2024**;

(5) A pre-trial conference will be set by separate order.

Signed: June 7, 2024

Robert J. Conrad, Jr.
United States District Judge

22